UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| KORY GARVER, as the natural father and legal guardian of AMIE GARVER, a minor, | ) ) ) | |
| Plaintiff, | ) ) | 3:09-CV-00463-LRH-WGC |
| v. | ) ) ) | ORDER |
| WASHOE COUNTY, a political subdivision of the State of Nevada; DENA NEGRON, individually and in her capacity as social worker for WASHOE COUNTY; JULIE BRANDT, individually and in her capacity as social worker for WASHOE COUNTY; SHOSHONE TRIBAL POLICE DEPARTMENT; DOES 1-10, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Before the court are Defendant Washoe County's Motion for Summary Judgment (#44[1])

and Defendants Dena Negron and Julie Brandt's Motion for Summary Judgment (#45).  Plaintiff

Kory Garver, as the natural father and legal guardian of Amie Garver, a minor, filed a consolidated

opposition (#48), to which Defendants replied (#49-50).

Contemporaneous with his opposition, Plaintiff also filed a Cross Motion for Summary

Judgment on Liability (#46).  Rather than respond substantively, Negron and Brandt filed a Motion

---

[1]Refers to the court's docket entry number.

1  to Strike (#51), which Washoe County joined (#52).  Plaintiff filed an opposition (#53), to which

2  Defendants replied (#54-55).

3  **I.      Facts and Procedural History**

4        This is an action under 42 U.S.C. § 1983 involving the warrantless removal of a minor

5  child, Amie Garver, from the custody of her mother and her placement in protective custody,

6  allegedly in violation of the Fourth and Fourteenth Amendment rights of Amie and her father,

7  respectively.  Plaintiff Kory Garver is Amie's natural father but was subject to a restraining order

8  prohibiting contact with Amie and her mother, Rachel LaPrairie, at the time in question.  Rachel is

9  not a party to the action.

10       The Washoe County Department of Social Services originally became involved on May 6,

11 2009, after receiving a report concerning Amie's welfare due to alleged drug use by her mother.

12 On May 8, WCDSS social worker Julie Bauer met with Rachel and Amie.  During the meeting,

13 Bauer made Rachel aware of some concerns regarding the situation in her home.  Rachel admitted

14 she had smoked marijuana on occasion but denied other drug use.  Bauer did not remove Amie

15 from parental care at that time, however, and instead worked with Rachel to maintain a safe

16 environment for Amie in her home.  Rachel also completed a drug screen at Bauer's request.

17       On May 13, Bauer received the results of the drug screen, which was positive for

18 methamphetamine and amphetamine in Rachel's hair and urine samples and for marijuana in her

19 hair sample.  On May 14, Bauer contacted Rachel and arranged a home visit for May 15 to discuss

20 the drug screen and services to assist her.  At no time did Bauer indicate that she intended to

21 remove Amie from Rachel's care.

22       Later that day, Rachel took Amie camping at Pyramid Lake.  Rachel had apparently

23 informed her mother that she believed Social Services was going to remove Amie the next day and

24 she wanted to show her a good time.  At 8 p.m. on May 14, Officer Steven Brannen of the Pyramid

25 Lake Police Department received a radio call from the Washoe County Sheriff's Office requesting a

26

welfare check in response to a call from Rachel's mother.  Brannen testifies that he later spoke with the grandmother, who told him that it was possible that Rachel was potentially suicidal, had attempted suicide in the past, and that was the real reason for the welfare check.

Brannen located Rachel's empty vehicle at Sandhole Beach and requested assistance from Washoe County dispatch in locating the party.  Following a tip from the grandmother that Rachel always goes to Wino beach, just before 11:30 p.m. a sergeant and deputy with the Washoe County Sheriff's Office located Rachel and Amie's campsite, approximately one mile from their vehicle. Brannen arrived shortly thereafter.

When Brannen arrived, he became the officer in charge and took over the welfare check. Rachel was outside her tent and speaking with the search and rescue officers.  They advised him that when they arrived Rachel and Amie had been inside their tent sleeping, where Amie remained. The search and rescue officers had also made contact with two of Rachel's adult friends, and a few other people were in their tents sleeping.  No other children were observed.  Other people were also camping nearby but were not associated with Rachel's group.  It appeared to Brannen that the group's campfire had been extinguished, everyone had retired to their tents to go to sleep for the evening, and no illegal activity was occurring.

Rachel told Brannen that Amie was fine and still sleeping in the tent, which he observed. Brannen saw two sleeping bags, extra blankets, pillows, and Amie was inside the sleeping bag farthest from the tent opening.  Rachel also stated that she knew her mother was concerned because she had indicated she was upset because she believed social services was going to take Amie away from her.  She also stated that she had advised her social worker (presumably Bauer) where she was going and what she was doing.  Brannan and Rachel also spoke about Rachel's situation and what she needed to do to retain custody of Amie.

Brannen observed Rachel to be very cooperative, attentive, very coherent, aware of what was going on, and understanding of the circumstances.  At one point, Rachel was very upset, crying

3

1   and apologetic that they had to be called out to check on her.  At no time was Rachel uncooperative

2   or belligerent.  Brannen also observed, however, that Rachel's speech was a little bit slurred and

3   her eyes were bloodshot and watery.  Rachel consented to a preliminary breath test, which indicated

4   a blood alcohol level of 0.141.  Brannen then advised her that although her level was above the

5   legal limit for driving, she was not driving at that point and it appeared to him that she was able to

6   care for herself and Amie.  Although Brannen did not personally speak with Rachel's friends, the

7   other officers informed him that neither appeared to have consumed any drugs or alcohol.

8          In Brannen's assessment, welfare checked out "okay."  Rachel and Amie were in no need of

9   any medical care, appeared to be well taken care of, and had food, water and the necessities to

10   sustain life.  Also, it appeared to Brannen that no danger was posed to Amie by any person present

11   or by any objects or conditions in or around the campsite.  Brannen observed that their tent was

12   situated at a safe distance from the lake (about 200 feet) and at least two miles from the main

13   highway, separated by open, natural desert and the road to the campsite. As Brannen perceived no

14   illegal activity at the campsite, Rachel was not arrested and no criminal action was taken against

15   her or anyone else present.

16          But for any contrary direction from Social Services, Brannan would have left Rachel and

17   Amie at the campsite.  Nonetheless, it was his understanding of Pyramid Lake Police Department

18   policy that because Rachel had a file with Social Services he was required to contact them, advise

19   them of the situation so they could make a determination regarding removal of the child, and follow

20   their direction.  Because of spotty cell phone service in that area, Brannen radioed a request to

21   Washoe County dispatch to contact Rachel's social worker.  Brannen recalls advising dispatch that

22   he had located Rachel and Amie, both were in good health and Amie was well-taken care of but

23   Rachel had been drinking alcohol, and he had no concerns about Amie staying there.  Brannen also

24   may have indicated Rachel's blood alcohol level, that she was cooperative, and that other people

25   were present that could care for Amie.  Brannen maintains the only negative information given to

26

4

1    dispatch was that Rachel had been drinking alcohol.  He denies telling dispatch that Rachel was

2    uncooperative, belligerent, that the other people at the campsite were intoxicated, or that he had any

3    concerns about Rachel's ability to care for Amie.  Brannen did not speak directly to Social Services

4    but instead requested dispatch to relay the information.

5          The call from Washoe County dispatch to Social Services was received not by Bauer, but by

6    the on-call social worker, Defendant Julie Brandt, at her home.  Brandt had no prior involvement

7    with Rachel and Amie, did not speak with Bauer, and did not have Bauer's case file.  Brandt did

8    have online computer access to the family history, however, which indicated an open case file on

9    Rachel, an investigation against the father regarding sexual abuse of Amie, Rachel's positive drug

10   screen, and a home visit scheduled for the next day.  Although the drug test was conducted on May

11   8, Brandt assumed that it was conducted May 11 or 12.

12         Consistent with Brannen's testimony, Brandt testifies that she was informed by dispatch

13   that Pyramid Lake police were responding to a child welfare request from a grandmother; a young

14   mother was out at Wino Beach with her two-year-old child; the police had found the mother's car

15   empty and called out search and rescue to find her; the grandmother reported that the mother had

16   past suicidal ideations and past drug use, believed her child was going to be removed the next day

17   by Social Services and wanted to show her a good time; and the mother was intoxicated with a

18   preliminary breath test of 0.141.  In stark contrast to Brannen's testimony, however, Brandt testifies

19   she was informed that the mother was belligerent and uncooperative, there were three or four other

20   adults in the party who were also drinking, and the police were concerned about the child's welfare

21   because her mother was not in good condition.  Although she was told that Amie was in good

22   condition, Brandt denies being told that welfare checked out okay or that Amie was well taken care

23   of.  Brandt testifies she was neither told nor inquired about the condition of the campsite or how

24   close to the lake it was, nor did she go out to the campsite to observe it firsthand.  Based on her

25   knowledge of Wino Beach, however, Brandt believed that tents could be placed within a block or

26

1    half block of the water depending on the lake level, and that there is a wide open desert with about

2    a half mile until a fast highway. Brandt was concerned that because she was at a campsite with

3    intoxicated adults, if unsupervised Amie could potentially wander off and go into the lake, go out

4    on the highway, get lost in the desert, or be molested by those in her party.

5         In determining whether to remove a child from parental custody, Brandt would make a

6    decision and then call the on-call supervisor if it was after hours to review the situation and her

7    decision. Accordingly, at approximately 11:30 or 11:45 p.m., Brandt phoned the on-call

8    supervisor, Defendant Dena Negron, who was asleep at home. Like Brandt, Negron also did not

9    have any prior familiarity with Rachel and Amie. Brandt testifies she informed Negron that

10   Pyramid Lake police conducting welfare check had informed her they had a young mother at

11   Pyramid Lake with her two-year-old child, the mother was intoxicated with a preliminary breath

12   test of 0.141, she was acting belligerent and uncooperative, there were other adults in her party that

13   were also drinking, the mother believed that her child was going to be removed by Social Services

14   the next day, and the grandmother had reported that the mother had past suicidal ideations and past

15   drug use. Brandt also informed Negron about the family history in the Social Services computer

16   files. Brandt then indicated she was strongly considering placing the child into protective custody

17   at an emergency foster home. In Brandt's view, placement with family was not an option because

18   she did not have the grandmother's contact information, and the child could not be placed with the

19   father due to the outstanding restraining order.

20        Negron agreed with Brandt's assessment that Amie needed to be placed in foster care

21   because she was under imminent threat of bodily harm. As Brandt could not place a child without

22   a supervisor's permission, consultation and direction, she authorized and instructed Brandt to

23   remove Amie from her mother's care. Negron testifies that she based her decision on the facts that

24   the mother had a history with the agency and tested positive for drugs within the last five to ten

25   days, there was a concern about the mother's mental stability given her history of and possibly

26

6

1  current suicidal ideations, and Brandt's advisement that there was no capable or appropriate

2  caregiver because the mother and the other adults in the party were all intoxicated.  Negron also

3  considered Amie's age and vulnerability and their proximity to a lake where drowning could occur.

4  Negron was unaware that Rachel, Amie and the rest of their group were asleep in their tents when

5  police arrived, she denies being informed that the police had reported that welfare checked out

6  okay, she was unaware how close to the lake they were camped, and she has never been to the area

7  and is unaware what it looks like.  Negron also had no information that the mother was under the

8  influence of any medication or drugs besides alcohol, whether the mother had made any comments

9  about suicide that evening, or how recently the mother had made any references to suicide.

10       According to Brannen, approximately ten minutes after he radioed his inquiry to Washoe

11  County dispatch, he was advised by dispatch that the social worker in charge requested that Amie

12  be taken from Rachel and that they assist in transporting Amie to meet a social worker at Whiskey

13  Springs Road.  Brannen was given no explanation for the removal and did not speak directly with

14  anyone at WCDSS.  Nor did anyone from WCDSS go to Wino Beach to observe the situation.

15       Brannen indicated to Rachel that they were being required by WCDSS to take Amie from

16  her.  Rachel then woke up Amie and tried to explain to her what was happening.  Rachel also

17  vigorously objected that they not take Amie because none of the patrol cars had car seats, stating:

18  "I'm very adamant that Amie is not in any vehicle without a car seat.  She has to have a car seat."

19  Rachel then offered Brannen to use the car seat in her vehicle.  Brannen then drove Rachel and

20  Amie in his patrol car to their vehicle one mile east, the Washoe County also drove to that location

21  and placed the car seat into his patrol car, and Rachel buckled Amie into the car seat, which was

22  checked by the deputy.  The deputy then drove Amie to Whiskey Springs Road, where Amie was

23  turned over to Brandt, who took her directly to a foster home.

24       No warrant for Amie's removal was sought or obtained by any party.  Indeed, it appears that

25  no party involved even considered obtaining a warrant.  Negron was unaware that a warrant might

26

be required to remove a child from parental care and did not advise Brandt to seek one.  Brandt first became aware that warrants could be obtained when she learned that an attorney thought a warrant should have been obtained for a removal she conducted in December 2008.  However, Brandt was unaware of any procedures to obtain a warrant and neither sought nor obtained one.  At the time of Amie's removal in May 2009, neither Brandt nor Negron had ever obtained a warrant to remove a child and, to their knowledge, neither had WCDSS, which had no policy or procedures in place for obtaining warrants.  Discussions with the district attorney's office regarding obtaining warrants in child removal cases did not begin until the fall of 2009, several months after this event.

In August 2009, Amie's father, Kory Garver, brought this § 1983 action on behalf of himself and Amie.  The currently-operative Second Amended Complaint (#20) alleges that Amie's warrantless removal and placement into protective custody without exigent circumstances violated Fourth and Fourteenth Amendment rights of Amie and Garver, respectively.  It is further alleged that Amie's warrantless removal was conducted pursuant to a pattern and practice of Washoe County, and that the County has no established policies or procedures for seeking a warrant for the removal of a child.

In a prior Order (#29), this court denied a motion to dismiss by Defendants Washoe County, Negron and Brandt.  These Defendants now move for summary judgment, and Plaintiff cross-moves for summary judgment on the issue of liability.

**II.     Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, answers to interrogatories, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita*

1    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora*

2    *Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

3         The moving party bears the initial burden of informing the court of the basis for its motion,

4    along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v.*

5    *Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the

6    moving party must make a showing that is "sufficient for the court to hold that no reasonable trier

7    of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259

8    (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

9         To successfully rebut a motion for summary judgment, the non-moving party must point to

10    facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

11    *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might

12    affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

13    242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

14    judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute

15    regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

16    return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a

17    scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;

18    there must be evidence on which a jury could reasonably find for the party. *Id.* at 252.

19    **III.    Defendants Brandt and Negron**

20         Defendants Negron and Brandt move for summary judgment on the basis of qualified

21    immunity. In evaluating a claim of qualified immunity, the court must resolve two questions: (1)

22    whether, taking the facts in the light most favorable to the nonmoving party, the official's conduct

23    violated a constitutional right, and (2) whether the right was clearly established at the time of the

24    alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). "For a constitutional right to be

25    clearly established, its contours must be sufficiently clear that a reasonable official would

26

1   understand that what he is doing violates that right.  This is not to say that an official action is

2   protected by qualified immunity unless the very action in question has previously been held

3   unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

4   *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations and internal quotation marks omitted).  The

5   court has discretion as to which prong should be addressed first under the particular circumstances

6   presented, and if the answer to either is "no," then the official may not be held liable for damages.

7   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

8          Qualified immunity is "'an *immunity from suit* rather than a mere defense to liability" and is

9   an appropriate basis for granting summary judgment.  *Saucier*, 533 U.S. at 2001-02 (citation

10  omitted).  Where material facts are genuinely in dispute, however, a jury's resolution of those

11  disputes may be required before the court's determination of the official's entitlement to immunity.

12  *See Glenn v. Washington Cnty.*, --- F.3d ----, 2011 WL 5248242, *4 & n.7 (9th Cir. 2011).

13         Plaintiff alleges that the warrantless removal of Amie, his minor child, from the custody of

14  her mother and her placement in protective custody was conducted in violation of the Fourth and

15  Fourteenth Amendment rights of Amie and her father, respectively.  "The Fourteenth Amendment

16  guarantees that parents will not be separated from their children without due process of law except

17  in emergencies."  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107

18  (9th Cir. 2001).  Likewise, the Fourth Amendment protects children from warrantless seizure

19  except in emergencies.  *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007).  At

20  the time of the events in this case, the law was clearly established in the Ninth Circuit that officials,

21  including social workers, violate these rights if they remove a child without a warrant absent

22  "information at the time of the seizure that establishes 'reasonable cause to believe that the child is

23  in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably

24  necessary to avert that specific injury.'"  *Mabe*, 237 F.3d at 1106-07 (quoting *Wallis v. Spencer*,

25  202 F.3d 126, 1138 (9th Cir. 2000)); *see also Rogers*, 487 F.3d at 1297 (declaring the law to be

26

10

1   "clearly established").  Speculative danger insufficient; rather, there must be "specific, articulable

2   evidence that provides reasonable cause to believe that a child is in imminent danger of abuse."

3   *Wallis*, 202 F.3d at 1138.  Also, the imminence required is that the harm is likely to occur "in the

4   time that would be required to obtain a warrant."  *Rogers*, 487 F.3d at 1294 (citing *Mabe*, 237 F.3d

5   at 1108).  Because the same legal standard applies to Fourteenth Amendment familial association

6   claims and Fourth Amendment seizure claims, they may be analyzed together.[2]  *Wallis*, 202 F.3d at

7   1137 n.8.

8       Brandt and Negron first contend that they did not cause any constitutional injury because

9   they did not personally seize Amie.  They further argue that it was Officer Brannen who was the

10  officer in charge on the scene, had the responsibility for conducting the welfare check, and was

11  acting on his own authority in seizing Amie rather than on any instructions WCDSS.  The court

12  disagrees.  While the incident occurred on tribal land and Brannen was the officer in charge, he was

13  dispatched to the scene at the request of Washoe County dispatch and conducted the welfare check

14  in conjunction with county authorities, including two officers with the Washoe County Sheriff's

15  Office.  As evidenced by the testimony of the Pyramid Lake Chief of Police, law enforcement

16  jurisdiction in the Pyramid Lake is shared, not exclusive, and tribal police work in cooperation with

17  federal, state and county authorities.  Furthermore, while Brandt and Negron may not have been

18  able to accomplish Amie's removal without Brannen's cooperation and his exercise of authority, it

19

20      [2]This is not to say that the viability of the father's Fourteenth Amendment claim and the child's
    Fourth Amendment claim are necessarily coextensive.  Even if Amie's rights were violated by her
    removal from parental care, the father's rights would not be violated unless the seizure infringed upon

21  his personal right to familial association.  In that respect, the court notes that at the time of Amie's
    seizure Kory Garver was subject to a temporary order for protection against domestic violence

22  prohibiting contact with both mother and child and interference with the mother's custody, pending
    further hearing.  Also, the evidence reflects the existence of an open investigation against the father

23  regarding alleged sexual abuse of Amie.  Nonetheless, Defendants do not rely on such facts in moving
    for summary judgment, and the parties have not briefed the issue.  The court therefore declines to

24  resolve *sua sponte* what, if any, effect such facts may have on the father's familial association claim,
    as opposed to the child's warrantless seizure claim.

25

26

11

1    is a fantastical notion that Amie's seizure was the solely the result of Brannen's independent

2    actions and not caused by Brandt and Negron's conduct.  WCDSS did not simply receive a child

3    already seized.  As Brandt and Negron themselves characterized their actions, Negron authorized

4    Brandt to remove Amie from her mother's care, and Brandt requested Washoe County dispatch to

5    instruct the officers on the scene to remove the child and transport her to Whiskey Springs Road,

6    where Brandt personally received the child from a Washoe County deputy.  As Brannen testified,

7    but for the instructions from WCDSS to remove Amie, Brannen would have left her with her

8    mother at the campsite.

9        Brandt and Negron next contend that they are entitled to qualified immunity under the

10    standard of *Mabe* and *Rogers*.  Under this standard, no imminent risk of serious bodily injury was

11    suggested by the information in the WCDSS computer files alone.  Although there was an open

12    investigation against the father for alleged sexual abuse of Amie, the father was not present at

13    Pyramid Lake that evening.  Also, it was readily apparent that the assigned case worker had already

14    determined, after meeting with Rachel and with awareness of her past drug use and the positive

15    drug screen several days earlier, that no exigency existed and that Amie could safely remain in her

16    mother's custody at least until the scheduled home visit the next day.  *See Rogers*, 487 F.3d at

17    1296; *Mabe*, 237 F.3d at 1108 & n.2.  The question is thus whether the additional information

18    obtained during the welfare check on the evening of May 14, considered in conjunction with the

19    information already known, established reasonable cause to believe that Amie was then in

20    imminent danger of serious bodily injury in the time it would take to obtain a warrant.

21        Based on Brannan's first-hand observations on the scene, including the state of the

22    campsite, the conditions of the persons present and their capabilities of caring for Amie, and that

23    Amie was well-taken care of and sleeping soundly in her tent, it is apparent that Amie was not in

24    fact in imminent danger of serious bodily injury.  Nonetheless, the issue here is whether Brandt and

25    Negron's actions were objectively reasonable in light of the information known or available to

26

1   them at the time they acted, even if that information was erroneous.  *See Anderson v. Creighton*,

2   483 U.S. 635, 641 (1987); *Maryland v. Garrison*, 480 U.S. 79, 85, 87-88 (1987); *Espinosa v. City*

3   *& Cnty. of San Francisco*, 598 F.3d 528, 534-36 (9th Cir. 2010).  "Where an officer has an

4   objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be

5   held liable if the information supplied by other officers turns out to be erroneous." *Motley v. Parks*,

6   432 F.3d 1072, 1082 (9th Cir. 2005) (en banc).  Of course, the officer relying on the information

7   has "an ongoing duty to make appropriate inquiries regarding the facts received or to further

8   investigate if insufficient details are relayed." *Id.* at 1081.  "The lynchpin is whether the officer's

9   reliance on the information was objectively reasonable." *Id.* at 1082.

10          Given the stark differences in the testimony of Brannen, Brandt and Negron regarding the

11   information reported to and received from Washoe County dispatch regarding the circumstances

12   confronting officers at the scene, the court is unable to resolve on summary judgment whether

13   Brandt and Negron are entitled to qualified immunity.  *See Glenn*, --- F.3d at ----, 2011 WL

14   5248242, *4 & n.7; *Espinosa*, 598 F.3d at 532; *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir.

15   2002).  Genuine issues of material fact remain regarding what information was actually conveyed

16   by Brannen to Washoe County dispatch and received by Brandt and Negron.  A jury's resolution of

17   such disputed facts is critical to determining whether Brandt and Negron violated the Fourth and

18   Fourteenth Amendment rights of Amie and Kory Garver and the reasonableness of their belief in

19   the legality of their conduct.  *See Espinosa*, 598 F.3d at 532; *Wallis*, 202 F.3d at 1138.  Thus,

20   Brandt and Negron's motion for summary judgment on the basis of qualified immunity will be

21   denied without prejudice.

22   **IV.   Defendant Washoe County**

23          Municipalities are "persons" under § 1983 and may be liable for causing a constitutional

24   deprivation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  To establish municipal

25   liability under § 1983, the plaintiff must show (1) the plaintiff was deprived of a constitutional

26

13

1   right, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the

2   plaintiff's constitutional right, and (4) the policy was the moving force behind the constitutional

3   violation. *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

4   Significantly, "municipal liability cannot be founded on a theory of respondeat superior." *Webb v.*

5   *Sloan*, 330 F.3d 1158, 1163-64 (9th Cir. 2003). The actions of individual employees may support

6   liability against a municipality only if the constitutional violation was committed pursuant to an

7   official municipal policy, pursuant to a longstanding practice or custom, or by an individual

8   employee with final policymaking authority. *Id.* at 1164.

9       As recognized in *Rogers* in 2007, the law has been clearly established in the Ninth Circuit

10  since at least the *Mabe* decision in 2001, if not earlier, that a warrant is required to remove children

11  from parental custody absent exigent circumstances. *Rogers*, 487 F.3d at 1297 (citing *Mabe*, 237

12  F.3d at 1106; *Wallis*, 202 F.3d at 1138; *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997)).

13  Nonetheless, it is undisputed that at the time of Amie's seizure in May 2009, Washoe County had

14  no policy or procedures for obtaining warrants for the removal of children from parental custody.

15  Nor had Brandt, Negron, or apparently any other WCDSS employee ever obtained a warrant before

16  removing a child from parental custody. Washoe County accordingly does not attempt to deny that

17  its failure to seek a warrant for Amie's removal from parental care was pursuant to a longstanding

18  custom or practice. *See Wallis*, 202 F.3d at 1142-43. Nor does it deny that its practice or custom of

19  not seeking prior judicial authorization, or even recognizing that a warrant may be required,

20  constitutes deliberate indifference to the constitutional rights of parents and their children.

21      Instead, Washoe County contends its policies and procedures are "irrelevant." Like Brandt

22  and Negron, Washoe County maintains that Pyramid Lake police, not Washoe County employees,

23  seized Amie and removed her from parental care. For the same reasons discussed above as to

24  Brandt and Negron, the court rejects this argument. All at the direction of WCDSS personnel,

25  Amie was removed from parental custody, transported from Pyramid Lake by a Washoe County

26

1  deputy, and delivered to WCDSS personnel for placement in foster care.  The fact that the seizure

2  was accomplished on tribal land with the cooperation of tribal police does not alter this conclusion.

3  The County cites no authority to the contrary.

4        Washoe County also contends that Pyramid Lake Police Department policies, not Washoe

5  County policies, were the moving force behind any constitutional violation.  Specifically, the

6  County points to two policies of the Pyramid Lake Police Department: (1) to contact WCDSS

7  whenever an investigation involved a parent who had involvement with social services; and (2) to

8  take whatever action WCDSS dictates.  Washoe County posits that if not for the first policy

9  WCDSS would never have become involved, and if not for the second Amie would not have been

10  seized because Brannen conducted the seizure only because WCDSS requested it.

11        The County's causation argument strains credibility.  First, it is absurd to suggest that

12  Officer Brannan's decision to contact and coordinate with WCDSS absolved Washoe County of

13  any responsibility for any constitutional violations committed thereafter.  By that logic, the County

14  might as well blame Amie's grandmother for requesting the welfare check in the first place.

15  Second, while Officer Brannan's willingness to follow WCDSS directives certainly contributed to

16  the warrantless seizure of the child in this case, it cannot be seriously denied that Washoe County

17  policies were the moving force behind the warrantless seizure.  But for the instructions from

18  WCDSS to seize the child and deliver her to WCDSS personnel and the failure of WCDSS to

19  obtain prior judicial authorization, consistent with the lack of any County policies or procedures to

20  obtain a warrant, no warrantless seizure would have occurred.  As to municipal liability, Washoe

21  County's motion for summary judgment shall therefore be denied.

22  **V.   Punitive Damages**

23        Defendants Brandt, Negron and Washoe County all move for summary judgment on the

24  issue of punitive damages.  As to the County, Plaintiff expressly waives any claim for punitive

25  damages.  The County's motion shall therefore be granted in this limited respect.

26

1      As to Brandt and Negron, governmental employees acting in their individual capacities may

2 be liable for punitive damages if their conduct was malicious, oppressive, or in reckless disregard

3 of the constitutional rights of others. *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). As

4 discussed above, genuine issues of material fact exist regarding the information reported by

5 Brannen and relayed to Brandt and Negron and the reasonableness of Brandt and Negron's reliance

6 on whatever information they in fact received. Until such factual disputes are resolved, summary

7 judgment is not appropriate. Brandt and Negron's motion shall therefore be denied without

8 prejudice.

9 **VI.     Cross-Motion for Summary Judgment and Motion to Strike**

10      Plaintiff cross-moves for summary judgment on the issue of liability. In turn, Defendants

11 have moved to strike Plaintiff's cross-motion as untimely, as the cross-motion was filed after the

12 deadline for dispositive motions, although contemporaneously with Plaintiff's opposition to

13 Defendants' motions for summary judgment. Alternatively, Defendants request additional time to

14 file substantive oppositions to Plaintiff's cross-motion.

15      A cross-motion is not required for entry of summary judgment in favor of the opposing

16 party if it appears to the court that there are no genuine issues of material fact and the opposing

17 party is entitled to judgment as a matter of law. *See Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311

18 (9th Cir. 1982). Nonetheless, the court has already determined above that disputed issues of

19 material fact remain, precluding summary judgment to either party in this matter. Accordingly,

20 Plaintiff's cross-motion and Defendants' motion to strike shall be denied.

21 **VII.    Conclusion**

22      IT IS THEREFORE ORDERED that Defendant Washoe County's Motion for Summary

23 Judgment (#44) is GRANTED in part and DENIED in part.

24      IT IS FURTHER ORDERED that Defendants Negron and Brandt's Motion for Summary

25 Judgment (#45) is DENIED.

26

1    IT IS FURTHER ORDERED that Plaintiff's Cross Motion for Summary Judgment on

2 Liability (#46) is DENIED.

3    IT IS FURTHER ORDERED that Defendants Negron and Brandt's Motion to Strike (#51)

4 is DENIED.

5    IT IS FURTHER ORDERED that the parties shall lodge their proposed joint pretrial order

6 within thirty (30) days from entry of this Order.  *See* Local Rule 16-4 and 26-1(e)(5).

7    IT IS SO ORDERED.

8    DATED this 28th day of November, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE